**Mildred P. JONES, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. CIV.A. H035604.**

United States District Court, S.D. Texas, Houston Division.

March 31, 2005.

Donald Clifton Dewberry, Attorney at Law, Houston, TX, for Mildred P Jones, Plaintiff.

Julia Baird Denegre, OGC/SSA, Tasha Williams Stevenson, Special Ass't U.S. Atty, Dallas, TX, for Jo Anne Barnhart Commissioner of Social Security Administration, Defendant.

### MEMORANDUM AND ORDER

BOTLEY, United States Magistrate Judge.

Pending before the Court are Plaintiff Mildred P. Jones' ("Jones") and Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), cross-motions for summary judgment. Jones appeals the determination of an Administrative Law Judge ("ALJ") that she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental security income ("SSI") benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Jones' Motion for Summary Judgment (Docket Entry No. 13) should be granted, the Commissioner's Motion for Summary Judgment (Docket Entry No. 17) should be denied, the ALJ's decision denying benefits be reversed, and the case be remanded pursuant to sentence four to the Social Security Administration ("SSA") for further proceedings.

### I. *Background*

On August 31, 2000, Jones filed an application for disability insurance benefits and supplemental security income with the SSA claiming that she had been disabled and unable to work since April 18, 2000. (R. 13, 115–117). Jones alleges that she suffers from a variety of disabling conditions, including chronic back and hip pain, depression, hypertension, arthritis, and heart disease. (R. 14, 101, 147, 186). After being denied benefits initially and on reconsideration, Jones requested an administrative hearing before an ALJ. (R. 77–78, 86–88, 89).

A hearing was held on June 12, 2002, in Houston, Texas, at which time ALJ Harry L. Williams, Jr. ("Judge Williams") heard testimony from Jones and Cheryl Swisher, a vocational expert ("VE"). (R. 26, 35–59). In a decision dated September 27, 2002, Judge Williams denied Jones' application for benefits. (R. 25–33). On October 14,

2002, Jones appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R.20–21). The Appeals Council, on March 28, 2003, granted Jones' request to review the ALJ's determination and remanded the case to the ALJ for further resolution of Jones' maximum residual functional capacity and clarification of the effect of the assessed limitations on the claimant's ability to perform her past relevant work or any alternate work. (R. 105–106).

A supplemental hearing was held on June 13, 2003, before Judge Williams, in Houston, Texas, at which time Judge Williams heard testimony from Jones and Patricia Cowen ("Cowen"), a VE. (R. 13, 60–76). In a decision dated July 17, 2003, Judge Williams denied Jones' application for benefits. (R. 10–19). On July 25, 2003, Jones appealed Judge Williams' decision to the Appeals Council (R. 8–9), which, on September 30, 2003, denied Jones' request to review the ALJ's determination. (R. 5–7). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Jones filed her Original Complaint in this case on December 8, 2003, seeking judicial review of the Commissioner's denial of her claim of benefits. See Docket Entry No. 1.

## II. *Analysis*

### A. *Statutory Bases for Benefits*

■ SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* Social Security Administration, Social Security Handbook, § 2100 (14th ed.2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and dis-

ability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled. *See Brown v. Apfel,* 192 F.3d 492, 495 n. 1 (5th Cir.1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, September 2000, fixes the earliest date from which benefits can be paid. (R. 115–117). Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See also* Social Security Administration, Social Security Handbook, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled,* regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger,* 516 F.2d 1005, 1007 n. 1 (5th Cir.1975); *see also Perkins v. Chater,* 107 F.3d 1290, 1295 (7th Cir.1997). For purposes of Title II disability benefits, Jones met the special

earnings requirements on April 18, 2000, her alleged onset date, and continued to meet the requirements through the date of the ALJ's decision—*i.e.,* July 17, 2003. (R. 14, 18).

■ While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI. *See Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

### B. *Standard of Review*

#### 1. *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.,* 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo. See Merritt–Campbell, Inc. v. RxP Prods., Inc.,* 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.,* 199 F.3d 796, 798 (5th Cir.2000).

#### 2. *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir.2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson,* 309 F.3d at 272; *Brown,* 192 F.3d at 496.

■ When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart,* 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo,* or substitute its judgment for that of the Commissioner. *See Masterson,* 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

### C. *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel,* 209 F.3d 448, 453 (5th Cir.2000); *accord Boyd,* 239 F.3d at 704–05. The claimant has the burden to prove disability under the first four steps. *See Myers,* 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson,* 309 F.3d at 272; *Greenspan,* 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd,* 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

■ The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton,* 209 F.3d at 452; *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990); *Johnson v. Bowen,* 864 F.2d 340, 343 (5th Cir.1988); *Cook v. Heckler,* 750 F.2d 391, 393 (5th Cir.1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel,* 238 F.3d 592, 594 (5th Cir.2001); *accord Newton,* 209 F.3d at 452; *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999); *Selders,* 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton,* 209 F.3d at 452–53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

 A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler,* 707 F.2d 162, 165 (5th Cir.1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ....'" *Greenspan,* 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir.1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P. Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding [her] limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. §§ 404.1527 and 416.927).

7. The claimant has the residual functional capacity to perform a full range of light work.

8. The claimant's past relevant work as tester/food demonstrator did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

9. The claimant's medically determinable depression, lower back pain, and hip pain do not prevent the claimant from performing her past relevant work.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(e) and 416.920(e)).

(R. 18). Because the ALJ determined that Jones could perform her past relevant

work, he did not reach step five in the sequential evaluation process.

■ This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Jones' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir.1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D. *Issues Presented*

Jones contends that substantial evidence does not support the findings of the ALJ. Specifically, Jones argues that the ALJ failed to comply with the Appeals Council's remand order with respect to assessing Jones' residual functional capacity ("RFC"). *See* Docket Entry No. 13. Jones argues that the ALJ found, without explanation, that she had medically improved because in his 2002 decision, the ALJ determined that Jones had the RFC to perform less than the full range of light work and that Jones would have problems with concentration (R. 32); however, in the ALJ's 2003 decision, he concluded that

Jones had the RFC to perform a full range of light work (R. 18). *See id.*, at 7–11. Additionally, Jones claims that the ALJ failed to make explicit findings as to the physical and mental demands of Jones' past relevant work and compare that with what Jones was capable of doing in compliance with SSR 82–62. *See id.*, at 11–14. Jones next argues that the ALJ erred by not finding that Jones's factitious disorder and depression were severe mental impairments. *See id.*, at 15–20. Jones also asserts that the ALJ erred by failing to call a medical expert to testify, not providing any nonexertional limitations with respect to her mental impairment, not finding the same "severe" impairments despite the same medical evidence at the original and supplemental hearings, and not considering the side effects from her medications. *See id.*, 20–27. Finally, Jones contends that the ALJ failed to develop the record. *See id.*, at 27–32.

The Commissioner contends that the ALJ's findings are supported by substantial evidence. *See* Docket Entry No. 18.

### E. *Review of ALJ's Decision*

#### 1. *Objective Medical Evidence and Opinions of Physicians*

■ When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532, 110 S.Ct. 885; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the com-

bined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir.2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531, 110 S.Ct. 885.

■■■ The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment. *See id.* at 530–31, 110 S.Ct. 885; *Selders*, 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect. *See Zebley*, 493 U.S. at 529–30, 110 S.Ct. 885. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530, 110 S.Ct. 885. For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of

the specified medical criteria. *See id.* An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria. *See id.*

■■■ For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531, 110 S.Ct. 885 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. §§ 404.1526(a), 416.926(a). The applicable regulations further provide:

> (1)(i) If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A) You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B) You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii) We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531, 110 S.Ct. 885. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir.1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records and testimony submitted in connection with Jones' administrative hearing reveals that Jones was treated several times in 1999 as an outpatient at the Harris County Hospital District ("HCHD") for arthritis, sinusitis, heart disease, chest colds, and a burned right arm. (R. 235–245). On May 11, 1999, Shelley D. Manning's, M.D. ("Dr.Manning") noted Jones' complaints of neck pain. (R. 243). Dr. Manning's impression was that Jones had arthritis and neck pain, and she prescribed medication. (R. 243). On May 24, 1999, Dr. Manning reported Jones' complaints of right him pain and occasionally falling. (R. 242). Dr. Manning noted that Jones' hip was tender to palpitation. (R. 242). Dr. Manning scheduled an x-ray of Jones' hip and referred Jones to a rheumatologist. (R. 242). Jones, however, did not keep the appointment with the rheumatologist. (R. 238).

On January 14, 2000, Jones was treated as an outpatient at the Harris County Hospital District ("HCHD"), reporting complaints of depression and sinusitis. (R. 234). On January 28, 2000, Jones was treated at HCHD for arthritis, allergic rhinitis, chronic back pain, heart disease. (R. 220). Tenderness was noted in her hip and lumbar spine. (R. 220).

On March 9, 2000, Jones was treated as an outpatient at the HCHD, reporting complaints of bilateral pain and swelling off and on for three months. (R. 233). The examination revealed swelling in her right hand and a limited range of motion secondary to pain. (R. 233). She was diagnosed with arthritis, and prescribed medication. (R. 233).

In April 2000, Jones reportedly fell in a grocery store, injuring the right side of her body (*e.g.,* arm, hand, shoulder, hip, muscles). (R. 208, 251). On April 25, 2000, Jones was treated by Ulysses Watkins, Jr., M.D. ("Dr.Watkins"), who ordered x-rays of her right side and skull, prescribed medication, and recommended physical therapy. (R. 208).

On May 8, 2000, Dr. Manning treated Jones at HCHD for chest pain. (R. 231). At that time, Jones' blood pressure was reported as 148/88. (R. 231). An EKG was performed and Dr. Manning referred her to the emergency room for evaluation. (R. 231). She was placed on an IV and transported by ambulance. (R. 231). On May 9, 2000, Jones returned to Dr. Watkins for a follow-up appointment. (R. 209). Dr. Watkins noted that Jones continued to experience tenderness to palpitation in her right hand, arm, and shoulder. (R. 209). He recommended for her to resume physical therapy and medications. (R. 209).

On August 9, 2000, x-rays were taken of Jones' thoracic spine and right hip. (R. 248–249). On August 23, 2000, Jones returned to HCHD for laboratory and x-ray results. (R. 230). She continued to report pain in her back and hip. (R. 230). A review of Jones' x-rays revealed normal bones and joints, normal vertebral disc spaces with small osteophytes prominent in the lower segment, and no evidence of paraspinal mass. (R. 230, 248–249). Dr. Manning's impression was that Jones had musculoskeletal strain to the right side of the thoracic area extending to the right hip and lumbar spine area. (R. 230). Dr. Manning diagnosed Jones with hypertension, allergic rhinitis, and back pain. (R. 230). It was recommended that Jones continue with her physical therapy. (R. 230).

On September 8, 2000, was evaluated at HCHD and an Outpatient Physical Therapy Back Screen was completed by physical therapist M. Miller ("Miller"). (R. 228–229). Miller observed tenderness and decreased mobility. (R. 228). It was recommended that Jones receive physical therapy twice a week for four weeks. (R. 229).

In a statement dated September 12, 2000, Miller indicated that Jones had a unilateral extended sacrum that was causing her decreased ability to bear weight on her right leg and stand for extended periods of time. (R. 210). According to Miller, Jones was receiving therapy for this problem, and would be away from work until it was resolved. (R. 210). Jones continued with physical therapy in September and November 2000, showing improvement. (R. 225–227).

On January 17, 2001, Jones presented at HCHD, crying and claiming her back pain was intense. (R. 218). Jones reportedly was "very upset" because she received an eviction notice and was unable to work to pay her rent and utilities. (R. 218). It was noted that Jones had never seen a social worker or case manager. (R. 218). It was recommended that Jones see a social worker/case manager to assist with shelter. (R. 218).

On February 13, 2001, Theodore Pearlman, M.D. ("Dr. Pearlman") performed a consultative psychiatric examination of Jones. (R. 251–255). Dr. Pearlman diagnosed Jones with factitious disorder[1] with psychological and physical signs and symptoms. (R. 254). Dr. Pearlman opined that the tell-tale features of factitious disorder with psychological symptoms were evident in Jones' evasive and vacillating answers.

(R. 253). According to Dr. Pearlman, there was no overt evidence of clinical depressive disorder and no evidence of psychosis. (R. 253). He also reported that dependent and histrionic personality traits were evident during the examination. (R. 254). Dr. Pearlman evaluated Jones with a Global Assessment of Functioning ("GAF") of 75.[2] (R. 254). Dr. Pearlman concluded that there was nothing in the mental status examination or in Jones' history to cause him to suspect that Jones was not able to reason and make occupational, personal, and social adjustments if she chose to do so. (R. 253).

On February 26, 2001, Dr. Manning evaluated Jones for chronic back pain and depression. (R. 216–217). Dr. Manning noted tenderness in lower spine and upper hip. (R. 216). Dr. Manning referred Jones to the physical therapy clinic for evaluation. (R. 217).

On March 16, 2001, Jones presented at HCHD for lower back and hip pain. (R. 215). It was noted that Jones had a history of chronic right hip and low back pain secondary to falling in April 2000. (R. 215). It was further noted that Jones had a course of physical therapy, but it was discontinued because Jones complained that her hip was coming out of place. (R. 215). Jones was diagnosed with chronic

---

1. "Factitious disorder" refers to a mental disorder characterized by repeated, intentional simulation of physical or psychological signs and symptoms of illness for no apparent purpose other than obtaining treatment. It differs from malingering in that there is no recognizable motive for feigning illness. It is subtyped on the basis of whether the predominant signs and symptoms are physical (called also Munchausen syndrome), psychological, or both. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 529 (29th ed.2000).

2. A GAF score represents a clinician's judgment of an individual's overall level of functioning. See AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM–IV–TR") 32 (4th ed.2000). The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning. The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. A GAF rating of 75 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressor (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). See id. at 34.

low back and right hip pain and depression. (R. 215).

On May 8, 2001, Jones visited HCHD due to chronic right hip and back pain. (R. 212–214). X-rays taken that day of Jones' right hip showed degenerative disease of the right hip. (R. 291). It was reported that there was a concentric narrowing of the left hip which may be due to cartilage degeneration secondary to degenerative joint disease. (R. 291).

On June 5, 2001, Jones was treated at HCHD for anxiety, depression, chronic low back and hip pain. (R. 286). Jones' medications were reviewed and it was recommended that she have a nuclear bone scan. (R. 286). On June 13, 2001, Jones underwent a three phase bone scan, which was abnormal. (R. 287). There was no evidence of hip disease, but there was an acute osteoblastic lesion in the right facet joint of L5, which was typical in appearance of a fracture. (R. 287). Consideration, however, was also given to the possibility of a mass compressing the ureter and eroding into the bone. (R. 287). A CT scan of the abdomen and lumbar spine was recommended. (R. 287).

On July 20, 2001, Jones was evaluated at HCHD and an Outpatient Physical Therapy Back Screen was completed by physical therapist, L. Bramlett ("Bramlett"). (R. 284–285). Jones reported chronic pain in her lower back and hip. Bramlett observed decreased mobility. (R. 284). An EMG was scheduled for Jones. (R. 284).

On August 7, 2001, Dr. Manning reported tenderness in Jones' right posterior hip. (R. 283). Dr. Manning diagnosed Jones with right hip pain, hypertension, and back pain. (R. 283). On August 15, 2001, Jones underwent a CT scan of her lumbar spine, pelvis, and abdomen. (R. 280–282). The CT scan of Jones' lumbar spine revealed severe osteoarthritic changes of the right facet joint with no evidence of foraminal narrowing. (R. 280). Degenerative

changes also were observed to a slightly lesser extent at L4–L5, L3–L4, and L2–L3 bilaterally. (R. 280). Otherwise, there was no evidence of disc herniation, or central or foraminal canal stenosis. (R. 280). The CT scan of her pelvis showed punctate calcification in the right lower pelvis; a 2 × 2 cm. hypodensity in the uterus which was speculated to represent a Nabothian cyst versus a fibroid; and degenerative changes in the lower thoracic and lumbar spine. (R. 281). The CT scan of her abdomen revealed right renal pelvis mild fullness; proximal right ureter mild dilation; and punctate calcification in the right lower pelvis. (R. 282). It was noted that the bones were significant for degenerative changes. (R. 282).

On November 5, 2001, Dr. Manning treated Jones for hip and back pain. (R. 279). Although the physician's handwritten notes are not fully legible, it appears that she was diagnosed with arthritis, right hip pain, back pain, and allergic rhinitis. (R. 279). It was noted that Jones had been seen by "ortho" on October 27, 2001, and that she had an "MRI at ortho appt pending." (R. 279).

On February 22, 2002, Farrell A. Hillman, M.D. ("Dr.Hillman") completed a Psychiatric Review Technique form of Jones, opining that her diagnosis of factitious disorder was not severe enough to meet Listing 12.07 (Somatoform Disorders). (R. 256–269). According to Dr. Hillman, Jones experienced mild restriction of activities of daily living, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. (R. 266). Dr. Hillman opined that her alleged limitations caused by her symptoms of depression were not fully supported. (R. 268). Dr. Hillman's assessment was reviewed and affirmed by Robert M. Gilliland, M.D. (R. 256).

Also, on February 22, 2002, John R. Wiley, M.D. ("Dr. Wiley"), completed a Physical Residual Functional Capacity form of Jones. (R. 270–277). Dr. Wiley found that Jones could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about 6 hours in an 8–hour workday, sit about 6 hours in an 8–hour workday, push and/or pull without limitation other than that shown for lifting and/or carrying, and had no postural, manipulative, visual, communicative, or environmental limitations. (R. 271–274). According to Dr. Wiley, Jones' alleged limitations due to her symptoms were not fully supported. (R. 275). Dr. Wiley's assessment was reviewed and affirmed by E.R. Leggett, M.D. (R. 277).

On June 12, 2002, Jones testified at her first administrative hearing that she was unable to work due to her hip problems and depression. (R. 41). She also stated that she experienced swelling in her hands and legs. (R. 41). Jones claimed that she was only able to stand for a short time because she felt like her spine was going to break. (R. 44). She stated that she drives about once a month and relies on her family to take her places. (R. 45). She maintained that she was only able to walk a short distance before her hip went out. (R. 45). She testified that she has used a cane since 2000. (R. 45–46). Jones further asserted that when she tries to sit, she experiences muscle spasms. (R. 46). Jones stated that she was able to pick up small things and did not have any problem getting along with others. (R. 46). She claimed that she had problems sleeping and took medication. (R. 46). She also stated that she took medication for pain, but it caused side effects of dizziness and blurred vision. (R. 48). Jones testified that she seldom cooks and relies on her family to help around the house. (R. 48).

Following Jones' first administrative hearing, Aaron M. Levine, M.D. ("Dr.Le-vine") performed a consultative examination of Jones on July 9, 2002. (R. 292–298). Jones reported to Dr. Levine that her back problems first developed when she fell and twisted her back in 1989; a subsequent motor vehicle accident contributed to her back problems; and, a fall in 2000 allegedly caused her increased back pain and a dislocated hip. (R. 292). Dr. Levine noted Jones' complaints of right body pain, involving her neck, low back, flank, and upper and lower extremities. (R. 292–293). Dr. Levine, however, found no neurological deficits. (R. 297). He opined that Jones had a significant amount of symptom exaggeration. (R. 297). An x-ray of Jones' lumbar spine taken on July 9, 2002, revealed mild left-sided curvature with otherwise normal alignment. (R. 299, 301). No fracture, dislocation, or other acute osseous abnormality was observed. (R. 299, 301). The disc spaces were normal in width, but there were hypertrophic changes around the facets around L4–5 and L5–S1. (R. 299, 301). The S1 joints and soft tissues were unremarkable. (R. 299, 301). The physician's impression was degenerative changes without acute osseus abnormalities. (R. 299, 301). Dr. Levine assessed that she would have difficulty sitting, standing, walking, climbing, balancing, stooping, crouching, kneeling, or crawling. (R. 302–303). He found no limitations to her ability to perform work-related activities. (R. 302–303). At the time of Dr. Levine's evaluation, Jones was 61 years of age. (R. 292).

On June 13, 2003, Jones testified at the supplemental administrative hearing that she was unable to work due to inability to stand for long periods of time, and not being able to bend, stoop, or reach. (R. 65–66). Jones stated that she has arthritis in her hands and that they swell. (R. 66). According to Jones, her right hand was worse. (R. 72). Jones claimed she has pain in her lower back and right hip that

radiates down to her feet. (R. 72). She maintained that she was able to lift a gallon of milk, but must use both hands. (R. 72). Jones testified that she takes medication for her depression was being treated by a psychiatrist at Ben Taub Mental Health. (R. 71). Jones stated that she does not do much around the house. (R. 71).

### 2. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> ... only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work ....

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir.2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir.1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir.1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "[she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir.1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96–8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and

mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work.... RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.... The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474–01 (July 2, 1996). The court further commented:

Second, SSR 96–9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities.... The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96–9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler,* 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Mathews,* 545 F.2d 975, 977–78 (5th Cir.1977)).

In the case at bar, in its remand order, the Appeals Council expressly directed the ALJ to resolve the following:

- The decision found that the claimant retained the residual functional capacity for less than the full range of light work, and that she will have problems with concentration (decision, finding number 7). Those particular findings are imprecise. The extent of the reduction of the ability to perform all the demands of light work was not specified. Similarly, the reference to the claimant having some concentration problems is vague and does not specifically address what mental work related functions the claimant can still perform. Further evaluation is necessary to explain the extent of the claimant's limitations and provide a specific, function by function residual functional capacity as directed by Social Security Ruling 96–8p.

- The decision does not contain a comparison between the claimant's functional limitations and the physical and mental demands of the past job. The decision must contain rationale to show that the claimant's functional limitations do not prevent her from meeting the physical and mental demands of job(s)

the claimant has performed in the past. Otherwise, the Administrative Law Judge must compare the claimant's established residual functional capacity to the functional demands and job duties of the job/occupation as generally required by employers throughout the national economy.

(R. 105). The Appeals Council instructed the ALJ on remand to do the following:

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 C.F.R. §§ 404.1545 and 416.945 and Social Security Rulings 85–16 and 96–8p). Make specific function by function residual functional capacity findings.

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's ability to perform her past relevant work or any alternate work. (SSR 83–14). Identify all the demands of the claimant's past relevant work, both as she performed it and as generally performed in the national economy. If evaluation proceeds to the question of ability to perform any alternate work, the hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 C.F.R. §§ 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics

of Occupation (Social Security Ruling 00–4p).

(R. 106).

■■■ On remand, the ALJ failed to comply with the Appeals Council's order. The ALJ failed to make the function by function RFC findings as directed by SSR 96–8. (R. 13–18). The ALJ also failed to make findings as to the physical and mental demands of Jones' past relevant work and compare that with what Jones was capable of doing in compliance with SSR 82–62. At the supplemental hearing, the ALJ merely questioned the VE as to whether Jones could return to any of her past relevant work if she was limited to standing or walking for a maximum of four hours a day because of hip and back pain, which the VE replied, "no." (R. 74–75). After confirming with the VE that all of Jones' past relevant work required the full range of light exertion and that if a limitation regarding standing was placed on Jones that she would have no transferable skills, the ALJ inexplicably changed his RFC finding from his original opinion (*i.e.,* less than a full range of light work) to a new RFC (*i.e.,* full range of light work). (R. 18, 32). Moreover, contrary to the ALJ's decision, the record is devoid of any testimony to support the ALJ's finding that based on Jones' RFC she "could return to her past relevant work as a tester/food demonstrator as performed by the claimant and as performed in the national economy." (R. 17). As such, the Commissioner's contention that "there is an implication" that [the ALJ] has complied with [SSR 82–62] and that any error was "harmless" must be rejected.

Because the ALJ's decision is not supported by substantial evidence, this case must be remanded for further consideration of Jones' residual functional capacity. On remand, the ALJ shall consider Jones' maximum residual functional capacity and

provide appropriate rationale with specific references to evidence of record in support of the assessed limitations. The ALJ shall make specific function by function residual functional capacity findings. Additionally, the ALJ shall obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Jones' ability to perform her past relevant work or any alternate work. The ALJ shall identify all the demands of Jones' past relevant work, both as she performed it and as generally performed in the national economy.

### 3. *Additional Matters*

■■■ On remand, the ALJ shall consider all of Jones' impairments (*i.e.*, depression, hypertension, degenerative disc disease of the lumbar spine, lower back pain, and hip pain) in drawing his conclusion as to whether Jones' impairments meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.[3] The ALJ also shall further develop the record as to Jones' mental health, including obtaining medical evidence from treating sources.[4] Thereafter, if warranted, the ALJ should consider the retention of a medical expert to assist with the evaluation of whether any of Jones' impairments meet or medically equal the listing requirements, medication side effects, and any limitations such impair-

ments or medication side effects may pose on Jones' RFC. Further, in determining Jones' RFC, the ALJ shall take into consideration Jones' alleged mental and physical impairments and include all of such "severe" impairments in any hypothetical posed to the VE.

### III. *Conclusion*

Accordingly, it is therefore

**ORDERED** that Jones' Motion for Summary Judgment (Docket Entry No. 13) is **GRANTED**. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 17) is **DENIED**. It is further

**ORDERED** that the case is **REVERSED** and **REMANDED**, pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to resolve the issues identified, *supra.*

---

3. Although no new medical evidence was proffered at the supplemental hearing (R. 63), the ALJ changed Jones' medically determinable impairments in his supplemental decision, leaving off degenerative disc disease of the lumbar spine and hypertension. (R. 14, 28).

4. Jones was not represented by an attorney during her administrative hearings, but, instead, by a paralegal with Lone Star Legal Aid. (R. 37, 62). Because Jones was not represented by counsel, the ALJ had a heightened duty to develop the record. *See Kane v. Heckler,* 731 F.2d 1216, 1219 (5th Cir.1984).

Prior to the supplemental hearing, the ALJ should have requested medical records from additional physicians treating Jones. An undated list of Jones' medications and medical treatment reveals that she was prescribed four medications for depression by Dr. Catherine Stevenson, and received medical treatment in 2003 from Dr. Manning, as well as three other physicians. (R. 203, 205). Additionally, Jones' testimony at the supplemental hearing revealed that she was receiving psychiatric treatment from Ben Taub Mental Health. (R. 71). These medical records were not made part of the administrative record.